**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**LAURIE VALENTINE,**

     **Plaintiff,**

                    :

    **v.**                             **Case No. 2:24-cv-357**
                                  **Chief Judge Sarah D. Morrison**
**RIVERSIDE RADIOLOGY AND**      **Magistrate Judge Kimberly A.**
**INTERVENTIONAL**               **Jolson**
**ASSOCIATES, *et al.*,**           :

     **Defendant.**

## OPINION AND ORDER

Laurie Valentine was a registered nurse at Riverside Radiology and

Interventional Associates for nearly 18 years. Ms. Valentine suffers from an

autoimmune disorder affecting her eyes. In October 2021, she was prescribed

chemotherapy IV treatment which would require her to periodically take off work.

She advised her employer of her need for intermittent time off and a month later

she was accused of violating Riverside's clock-in policy. In January 2022, she was

terminated.

Ms. Valentine sued Riverside, Premier Imaging Ventures, LLC dba

LucidHealth, and John Does #1–10. After discovery, Defendants moved for

summary judgment. (Mot., ECF No. 42.) Ms. Valentine responded (Resp., ECF No.

46), and Defendants replied (Reply, ECF No. 47). For the reasons below,

Defendants' Motion is **GRANTED**.

## I.    STATEMENT OF FACTS

### A.    Ms. Valentine's Work History

Ms. Valentine was hired by Riverside as a registered nurse in October 2004. (Valentine Depo., 11:11–14, ECF No. 41-1.) She worked at several different locations throughout her tenure, eventually landing at Riverside's Dublin, Ohio location as a Lead RN. (*Id.*, 14:15–24.)

Julie Boynton became Ms. Valentine's direct supervisor around 2011. (*Id.*, 13:5–13.) Ms. Valentine and Ms. Boynton shared an "excellent working relationship" for years. (*Id.*, 24:15–18.) Ms. Boynton applauded Ms. Valentine's performance, stating she was impressive, a great teacher, competent, honest, trustworthy, reliable, and had Riverside's best interests in mind. (Boynton Depo., 32:1–13.) In fact, Ms. Valentine consistently received above average performance evaluations. (Resp., PAGEID # 386.) For example, between August 2019 and July 2020, Ms. Valentine was evaluated in 11 categories, and she received a top score in several, including work quality and productivity. (Boynton Depo., 45:14–17; 49:6–18.) As for attendance, Ms. Boynton rated Ms. Valentine as meeting requirements for being "on time for work" and "start[ing] and end[ing] work at the assigned times." (*Id.*, 56:18–58:22.) Until she was fired in 2022, Ms. Valentine had no disciplinary record or attendance issues. (Resp., PAGEID # 388.)

### B.    Ms. Valentine's Autoimmune Disorder

Around 2004, Ms. Valentine began to experience symptoms of what was later diagnosed as an autoimmune disorder affecting her eyes. (Valentine Depo., 38:6–39:5.) She had her first eye surgery in 2005 (*id.*, 39:2–40:2), and approximately 12

2

more outpatient procedures between 2005 and 2018. (*Id.*, 40:20–41:14.) Ms. Valentine took time off work for each procedure. (*Id.*, 41:23–42:16.)

In 2018, Ms. Valentine suffered a corneal ulceration related to her autoimmune disorder. (*Id.*, 25:1–6.) She used FMLA leave and additional leave once her FMLA leave was exhausted. (*Id.*, 41:4–5.) Fortunately, Ms. Valentine recovered and returned to work full-time. (*Id.*, 25:1–6.)

### C.    Ms. Valentine's October 2021 FMLA Eligibility

In October 2021, Ms. Valentine provided Ms. Boynton and the human resources manager (Julie Landholt) with notice that she would be starting an IV chemotherapy treatment for her autoimmune disorder. (*Id.*, 25:1–28:16; Mot., PAGEID # 312.) During that initial conversation, Ms. Valentine said she would need either FMLA leave or paid time off ("PTO"), but that she was unsure which she would use. (Valentine Depo., 28:13–16; Resp., PAGEID # 389.) According to Ms. Valentine, Ms. Boynton responded with hesitation, stating, "I don't know if I can let you do that because we're short staffed." (Valentine Depo., 25:17–18.) Ultimately, Ms. Boynton and Ms. Landholt both told Ms. Valentine that she was required to first use PTO before FMLA. (*Id.*, 35:6–10.)

Ms. Valentine and Ms. Boynton met again on November 8, 2021, as evidenced by Ms. Boynton's note:

3

11/8 – rec. text from employee – having chemo tx
11/18 q 11/19 | 12/2 + 12/3 – employee not
using FMLA – this was encouraged
per employee will use PTO
Informe Employee that she needed to
use PTO for 3 -corp Holidays – any
have
Further call offs will result in written –
11/8/21

(ECF No. 46-1.)

Ms. Valentine never applied for FMLA, she used PTO instead. (Valentine Depo., 30:10–14, 33:5–14.) She had sufficient PTO to cover the time she needed for her chemotherapy and her request to use it was granted. (*Id.*, 32:2–5, 37:20–24.)

### D. Ms. Valentine's Termination

On November 24, 2021, an employee told Ms. Boynton that Ms. Valentine was late for work. (Boynton Depo., 94:6–95:1.) A week or so later, Ms. Boynton was doing payroll and noticed that Ms. Valentine clocked in at 7:28 am for her 7:30 shift on November 24. (*Id.*, 104:25–105:12.) But because she had been told that Ms. Valentine was late that day, she investigated further by obtaining timekeeping records from Defendants' mobile timekeeping app, PaychexSmartTime ("Paychex"). (*Id.*, 113:15–19.) Those Paychex records reflected that Ms. Valentine had clocked in 33 times from outside the office, even though Defendants prohibited employees from clocking in before they were physically in the office. (*Id.*, 148:21–149:4.)

Ms. Boynton presented the results of her investigation to Daniel Howell, the director of radiology services. (Howell Depo., 16:6–22, ECF No. 41-3.) Mr. Howell

4

then decided to terminate Ms. Valentine (*Id.*, 31:17–23); she was terminated on January 28, 2022. (Valentine Depo., 46:23–51:2.)

## II.   LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; see also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

## III.    ANALYSIS

Defendants move for summary judgment on all Ms. Valentine's claims: Count I for FMLA interference; Count II for FMLA retaliation; and Count III for disability discrimination under the ADA and Ohio law. Ms. Valentine abandoned Count III in her Response (Resp., PAGEID # 385), so Defendants' Motion as to Count III is **GRANTED**. The Court turns next to Counts I and II.

### A.    Count I: FMLA Interference

Ms. Valentine argues that Defendants committed FMLA interference by (1) encouraging her to use PTO in lieu of FMLA leave, and (2) not properly notifying her of her right to use FMLA leave.

An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). To establish a prima-facie FMLA interference claim, a plaintiff must prove that (1) she was an FLMA-eligible employee; (2) the defendant was an "employer" as defined under the FMLA; (3) she was entitled to FMLA leave; (4) she gave the employer notice of her intention to take leave; and (5) the employer denied or interfered with the FMLA benefits to which she was entitled. *Nuttall v. Progressive Parma Care Ctr., LLC*, No. 21-4199, 2022 WL 2952586, at *2 (6th Cir. July 26, 2022) (citing *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)).

"[T]he mere occurrence of interference with an employee's FMLA rights is not a *per se* FMLA violation." *Allen v. Butler Cnty. Comm'rs*, 331 F. App'x 389, 394 (6th Cir. 2009). Rather, the statute "provides no relief unless the employee has been prejudiced by the violation[.]" *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81,

89 (2002) (citing 29 U.S.C. § 2617(a)(1)); *see also id.* (citations omitted) ("The employer is liable only for compensation and benefits lost 'by reason of the violation,' for other monetary losses sustained 'as a direct result of the violation,' and for 'appropriate' equitable relief, including employment, reinstatement, and promotion."); *see also Edgar*, 443 F.3d at 507 ("[T]he FMLA is not a strict-liability statute."). Because Ms. Valentine was not harmed by Defendants' alleged FMLA interference, the Court starts and ends there.

Ms. Valentine first told management of her potential need for leave in October 2021, but she was unsure at that time whether she would use FMLA or PTO. Ms. Boynton and Ms. Landholt both told Ms. Valentine that she was required to first use PTO before FMLA. Fortunately for Ms. Valentine, she had enough PTO to cover the time she needed off and she used it without issue.

Even if that conversation amounted to improperly encouraging her to use PTO without telling her of her right to use FMLA, Ms. Valentine did not suffer any harm. She was granted leave and did not miss any medical treatments because of work. Had she elected to use FMLA leave, Defendants could legally require Ms. Valentine to use PTO concurrently, so the result would have been the same. *See Allen*, 331 F. App'x at 393 ("This Court … recognized that § 825.207(a) allows employers to run paid leave and unpaid FMLA leave concurrently.").

Accordingly, Ms. Valentine's FMLA interference claim fails as a matter of law. Summary judgment is **GRANTED** in favor of Defendants on Count I.

7

### B.    Count II: FMLA Retaliation

An FMLA retaliation claim "arises when an employer takes an adverse employment action against the employee for exercising or attempting to exercise a right protected by the FMLA." *Milman v. Feiger & Feiger, P.C.*, 58 F.4th 860, 866 (6th Cir. 2023); *see* 29 U.S.C. § 2615(a)(2). The burden-shifting test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to FMLA retaliation claims. *Edgar*, 443 F.3d at 508. So once a plaintiff satisfies the four elements of a prima facie FMLA retaliation claim, the burden shifts to the employer to proffer a legitimate, nondiscriminatory rationale for discharging the employee. *Id.* If the employer articulates a reason, then the employee has the burden of showing that the articulated reason is pretext for discrimination. *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 315 (6th Cir. 2001).

### 1.    Prima Facie Case

To establish a prima facie case of FMLA retaliation, a plaintiff must show: (1) she engaged in FMLA-protected activity; (2) the employer knew she was exercising her FMLA rights; (3) the employer took an adverse employment action against her; and (4) "there was a causal connection between the protected FMLA activity and the adverse employment action." *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (citations omitted). Defendants do not contest the first three elements.

To satisfy the fourth element at the prima facie stage, "all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (citation

omitted). Ms. Valentine argues a causal connection exists for several reasons: (1) the temporal proximity between when she said she needed FMLA leave and when Ms. Boynton initiated an investigation into her time clock violations; (2) the investigation was launched after a single incident of her clocking in before she arrived at the office despite working at Riverside for 18 years without a disciplinary record; and (3) Defendants' did not ask her for an explanation before initiating an investigation and terminating her employment. (Resp., PAGEID # 401.)

Ms. Valentine alerted Defendants about her potential need for FMLA in October and again in early November. Less than a month later, Ms. Valentine was late for work, and an investigation was initiated. Despite no disciplinary history, she was terminated. At the prima facie stage, Ms. Valentine has satisfied her "minimal" burden to show a causal connection between the retaliatory action and the protected activity. *Seeger*, 681 F.3d at 283; *see Randolph v. Ohio Dept. of Youth Services*, 453 F.3d 724, 737 (6th Cir. 2006) ("[A] temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection.").

### 2. Defendants' Non-Discriminatory Reason

The burden shifts next to Defendants to proffer a legitimate, non-discriminatory rationale for discharging the employee. They have done so – after an investigation, Ms. Boynton identified 33 occasions when Ms. Valentine clocked in off-site in violation of company policy.

9

### 3.    Pretext

The burden now shifts back to Ms. Valentine to show that Defendants' articulated reason is in reality a pretext to mask discrimination. She can meet this burden by "showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Seeger*, 681 F.3d at 285. This three-prong inquiry is not to be applied formulaically. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009). Rather, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id.* Although the inquiry can be distilled "into a number of component parts," at bottom, "summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation." *Id.*

Ms. Valentine makes two arguments in support of a finding of pretext. First, under a "cat's paw" theory of liability, she argues Mr. Howell unknowingly relied on Ms. Boynton's discriminatory animus when he made his decision to terminate her, so she was not really terminated for the stated reason. Second, she argues the Defendants did not honestly believe in the stated reason for her termination.

### a)    Cat's Paw Liability

"The primary rationale for the cat's paw theory of liability is that, because a company's organizational chart does not always accurately reflect its decisionmaking process, an employee of lower rank may have significant influence over the decisionmaker." *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 378 (6th Cir. 2017) (citation modified). "As a result, a biased low-level supervisor … might

10

effectuate the termination of an employee … by selectively reporting or even fabricating information in communications with the formal decisionmaker." *Id.* (citation modified).

Ms. Valentine argues Mr. Howell was improperly influenced by a biased Ms. Boynton. But Mr. Howell relied on the Paychex GPS data when he made his decision to terminate Ms. Valentine. (*See* Howell Depo., 31:21–23 ("This was solely based on the GPS information. I didn't take any other information into account in making my decision.").) Ms. Valentine has identified no evidence that Ms. Boynton selectively withheld information from Mr. Howell that could have reasonably led him to excuse Ms. Valentine's 33 violations of company policy.[1] Nor is there any evidence that Ms. Boynton fabricated the GPS data. Instead, Mr. Howell made an independent evaluation of the situation, relying on the Paychex GPS data.

Accordingly, a jury could not reasonably conclude that Ms. Boynton masked her discriminatory animus and improperly persuaded Mr. Howell to terminate Ms. Valentine.

### b)  Honest Belief

Ms. Valentine makes two arguments against Defendants' use of the honest belief defense: (1) Defendants did not honestly believe their non-discriminatory reason for terminating her and instead did so because they were concerned about

---

[1] Although Ms. Valentine argues that Ms. Boynton should have provided Mr. Howell with the GPS data for other employees, there is no evidence that any other employee clocked in from off-site.

staffing; and (2) Ms. Boynton's investigation was unreliable because she did not interview Ms. Valentine and the GPS data was flawed. Both arguments fail.

"The ground rules for application of the honest belief rule are clear. A plaintiff is required to show 'more than a dispute over the facts upon which the discharge was based.'" *Seeger*, 681 F.3d at 285 (citing *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001)). "[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). So long as "the employer held an honest belief in its proffered reason, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Id.* at 285–86 (citation modified). But "an employer's invocation of the honest belief rule" is not an automatic shield. *Id.* at 286. An employee can overcome an honest belief defense by producing evidence that suggests "an error on the part of the employer that is too obvious to be unintentional." *Id.* at 286 (citing *Smith*, 155 F.3d at 807).

Ms. Valentine has produced no evidence to create a genuine dispute of material fact as to whether Defendants honestly believed that she improperly clocked in for work on 33 occasions. She argues in conclusory fashion that if a jury were to find that Ms. Boynton improperly suggested PTO instead of FMLA leave because of staffing concerns, the jury could also find that Defendants did not honestly believe in their non-discriminatory reason for termination. But to show that Defendants were more concerned with a staffing shortage than her repeated

12

violations of company policy, Ms. Valentine must "put forth more than a 'scintilla' of evidence." *Walden v. General Elec. Int'l, Inc.*, 119 F.4th 1049, 1056 (6th Cir. 2024) (citation omitted). "Conjecture and conclusory accusations will not suffice," rather, Ms. Valentine "must present significant probative evidence putting the material facts in doubt." *Id.* at 1056–57 (citation modified). She has not done that.

Even if a staffing shortage motivated Ms. Boynton to suggest PTO instead of FMLA leave, that does nothing to address Ms. Valentine's 33 violations of company policy. Nor has Ms. Valentine produced evidence to suggest Defendants' response to her violations was disproportionate or was motivated by her FMLA eligibility.

Turning to the quality of the investigation, Ms. Valentine concedes that "an employer's belief may be honest without perfect investigation." (Resp., PAGEID # 406.) And she's right – courts "do not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith*, 155 F.3d at 807. Nor is a court to "micro-manage the process used" by an employer in reaching its decision. *Id.*

Nevertheless, Ms. Valentine critiques Ms. Boynton for acting without input from payroll or human resources and argues the investigation was "a witch hunt more than a fair investigation." (Resp., PAGEID # 408.) But the investigation was launched because on a day that Ms. Valentine was late for work, she clocked in on time, while off-site. (*Id.*, PAGEID # 391.) After finding an apparent error in the payroll records, Ms. Boynton secured GPS data from Paychex – that information revealed that Ms. Valentine had clocked into work when she was not in the office 33

13

times. And Ms. Valentine's attempt to undermine the accuracy of that data does nothing to address whether Defendants honestly and reasonably believed in its accuracy.

Ms. Valentine next complains that Defendants did not ask for her side of the story. Failure to afford an employee the opportunity to respond to the allegations against her may undermine an honest-belief defense, but it is not decisive. *Lilly v. Norfolk S. Corp.*, 556 F. Supp. 3d 802, 820 (N.D. Ohio 2021). And it is not decisive here. Ms. Valentine admitted it was against company policy to clock in off-site. (Valentine Depo., 49:10–12 ("It was a well-known fact that you don't clock in until you're in the building, and [Ms. Boynton] did repeat that in every staff meeting.").) So when the GPS data revealed she did so 33 times, it was reasonable not to ask for an explanation. Nor is it clear what Ms. Valentine could have said at the time of her termination to rebut the data considering the only evidence attacking its accuracy comes from an expert report. (*See* ECF No. 46-3.) Ms. Valentine needed to produce evidence of an error "too obvious to be unintentional" (i.e., one that would have been obvious at the time), not merely dispute the facts upon which Defendants based her termination. If the data required an expert to challenge its accuracy, it wasn't obvious enough to alert Defendants to seek Ms. Valentine's explanation.

Defendants made a reasonably informed and considered decision before terminating Ms. Valentine, so the honest belief defense applies; Ms. Valentine has failed to show that Defendants' non-discriminatory reason for termination was a

14

15

pretext to mask discrimination. Summary judgment is **GRANTED** in favor of Defendants as to Count II.

## IV.    CONCLUSION

For the reasons above, Defendants' motion for summary judgment (ECF No. 42) is **GRANTED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**